1
2
3
4                          UNITED STATES DISTRICT COURT
5                        NORTHERN DISTRICT OF CALIFORNIA
6

7   SAN FRANCISCO HERRING
    ASSOCIATION, et al.,                        Case No.  14-cv-04393-WHO
8                Plaintiffs,
9         v.                                     **ORDER DENYING MOTION TO
                                                 DISMISS**
10  PACIFIC GAS AND ELECTRIC                      Re: Dkt. No. 13
    COMPANY, et al.,
11               Defendants.
12

13        Plaintiffs San Francisco Herring Association ("SFHA") and Dan Clarke brought a

14  complaint against defendants Pacific Gas and Electric Company and PG&E Corporation

15  (collectively, "PG&E") arising from PG&E's operation of manufactured gas plants roughly one

16  hundred years ago.  Although these plants no longer exist, they allegedly left behind substantial

17  quantities of waste products that continue to contaminate the land in the Marina and Fisherman's

18  Wharf neighborhoods of San Francisco and the water of the San Francisco Bay.  According to the

19  complaint, the defendants failed to conduct adequate testing or remediation to eliminate the danger

20  this waste poses to the environment.

21        The defendants move to dismiss the plaintiffs' causes of action for violations of the Clean

22  Water Act ("CWA") and the Resource Conservation and Recovery Act ("RCRA"), alleging that

23  the plaintiffs lack standing and that they fail to state a claim upon which relief can be granted.  The

24  plaintiffs plausibly allege injury in fact and the factual basis for the challenged causes of action.

25  Therefore I DENY PG&E's motion to dismiss.

26                                    **BACKGROUND**

27        For purposes of PG&E's motion, I take the allegations of the complaint, which I

28  summarize in the next five pages, as true.  The defendants owned and operated manufactured gas

United States District Court
Northern District of California

plants ("MGPs"), highly polluting, low-tech refineries used in the nineteenth and early twentieth centuries to create gas from coal (or a combination of coal and oil, or other solid fuel sources). Compl. ¶¶ 2, 20 (Dkt. No. 1).  MGPs often spread across several city blocks, and consisted of multiple operations and buildings known as "gas works."  *Id.* ¶ 22.  Coal was "gasified" by heating it in oxygen-poor ovens.  The fuel gases generated were then purified of unwanted compounds before they were piped to consumers.  *Id.* ¶¶ 2, 20.  The gas issued from the coal and fuel stock was a "noxious soup of chemicals" and required reduction before the gas could be distributed.  *Id.* ¶ 23.

The reduction process created considerable solid and gaseous toxic waste.  *Id.* ¶ 24.  The waste produced was allowed to leach into the ground, dumped into waterways, or buried onsite. *Id.* ¶ 27.  These wastes allegedly still contaminate the sites of former MGPs and the areas where the waste was deposited.  *Id.*

Among the most problematic types of waste are coal residue solids and coal tar, because they contain chemicals known as polycyclic aromatic hydrocarbons ("PAHs").  *Id.*  PAHs are both lipophilic (easily dissolvable into fats, allowing them to cross biological membranes and accumulate inside organisms) and genotoxic (able to damage genetic information once accumulated inside an organism's cells, causing mutations).  *Id.*  Many PAHs associated with MGP waste are known carcinogens, and identified by the United States Environmental Protection Agency ("EPA") as toxic pollutants under 40 C.F.R. § 401.15.  *Id.*  Groundwater and aboveground water, contaminated soils, and toxic vapor commonly transport PAHs.  *Id.* ¶ 29.

MGPs were often situated in close vicinity to residential areas.  *Id.* ¶ 21.  The plaintiffs specifically point to the modern-day footprints of three MGPs:  the North Beach MGP, the Fillmore MGP, and the Beach Street MGP.  *Id.* ¶ 1.  The North Beach MGP was comprised of at least four city blocks, bounded by Marina Boulevard, Buchanan Street, North Point Street, Laguna Street, Bay Street, and Webster Street.  *Id.* ¶ 31.  Immediately west of the MGP was a canal opening up to the San Francisco Bay that was filled in 1912.  *Id.* ¶ 34.  PG&E owned and operated this site until at least April 1906.  *Id.* ¶ 31.

The Fillmore MGP was comprised of at least four city blocks, bounded by Fillmore Street,

Cervantes Street, Mallorca Way, Pierce Street, and Toledo Way. *Id.* ¶ 36.  PG&E owned and operated this site until at least April 1906. *Id.*

The Beach Street MGP was comprised of an area near Beach Street and Powell Street in the Fisherman's Wharf neighborhood. *Id.* ¶ 43.  PG&E owned and operated the site until at least the mid-1950s, when the property was sold and redeveloped for commercial use. *Id.*  The Radisson Hotel Fisherman's Wharf currently occupies portions of the site. *Id.* ¶ 86.

All of the subject MGP facilities were either abutting the San Francisco Bay shoreline or within a few hundred feet of it at the time of operations. *Id.* ¶ 86.

# I.  MGP WASTE CONTAMINATION

## A.  Contamination at Clarke's home

Plaintiff Clarke's home is a 0.08-acre parcel within the footprint of the North Beach MGP. *Id.* ¶ 55.  There is historical evidence that a coal bin was located in the vicinity of the home during the time that the MGP was in operation. *Id.* ¶ 56.  Small, lightweight "black rocks" are found in the home's backyard in shallow soil. *Id.*  They are typically similar in appearance to raw unprocessed coal or to solids reformed from a liquid state. *Id.*  In March of 2010, Clarke discovered two unusually large black rocks and handed them over to PG&E for testing. *Id.* ¶ 57. Test results indicated that the rocks contained MGP waste, and that their toxicity was "very high." *Id.*  Samples taken from one rock tested positive for several PAH compounds. *Id.* ¶ 58.  More black rocks were discovered in 2013, when an emergency sewer repair opened a small hole in the slab underneath the home. *Id.* ¶ 59.  Remnants of black rocks are also present throughout the footprint of the home. *Id.* ¶ 66.

PG&E tested samples of Clarke's soil, which revealed "significant" MGP waste, and showed that the contamination is widespread across the entire footprint of the home. *Id.* ¶ 60.  All locations from which soil samples were taken had high levels of benzo(a)pyrene equivalent ("B(a)P-EQ"), which indicates the degree of toxicity. *Id.* ¶ 62.  The California EPA uses a target of 0.9 ppm for B(a)P-EQ as the allowable limit. *Id.* ¶ 61.  A standard of 0.038 ppm of B(a)P-EQ is equal to a one in 1 million incremental risk of cancer. *Id.* ¶ 64.  At Clarke's home, the B(a)P-EQ levels tested as high as 1,149 ppm – or more than 1 in 100 risk of cancer. *Id.*

### B. Contamination of San Francisco Bay

According to the complaint, the natural hydrologic connection between the contaminants in groundwater and soil and the San Francisco Bay conveys MGP waste to the Bay. *Id.* ¶¶ 9, 54, 88-91. Another connection is man-made: in the 1970s, the City and County of San Francisco ("CCSF") constructed a combined sewer and stormwater collection system to transport waste to water treatment plants. *Id.* ¶ 93. A network of combined transportation and storage ("T/S") boxes was constructed along the perimeter of the San Francisco Bay. *Id.* The plaintiffs allege that the T/S network conveys MGP waste to the Bay in three ways: (i) via groundwater that flows at or near the subject MGP sites and eventually enters the T/S network; (ii) via groundwater washed into the T/S system during large storm events; and (iii) via the T/S network itself, as the water treatment process does not remove PAHs from water before it is discharged into the Bay. *Id.* ¶¶ 93-98.

Pacific herring are adversely affected by MGP waste discharged into the Bay. *Id.* ¶ 99. Herring traditionally have very high levels of productivity, and are an important commercial species and source of food for other species. *Id.* ¶¶ 108-09. However, PAHs are known to have "devastating" effects on herring, as they kill fertilized eggs and larva on contact or through photo-enhanced toxicity.[1] *Id.* ¶ 99.

Herring born in the Bay return to spawn there for up to eight years, traditionally along waterfront areas adjacent to the subject MGP sites. *Id.* ¶¶ 101, 109. Exposure to PAHs "both kills off a large portion of exposed fertilized eggs and larva and weakens those fish that survive the initial insult, decreasing the long-term survival of the fish, which, in turn, decreases the period of ecological services that the fish can provide." *Id.* ¶ 103. Because herring is a keystone species, a loss of fertilized herring eggs or larval herring is likely to have significant negative consequences for the species and for the pelagic food web almost indefinitely into the future. *Id.* ¶¶ 108-10.

## II. TESTING FOR MGP WASTE CONTAMINATION

The plaintiffs assert that PG&E has conducted only "piecemeal testing" for MGP wastes in

---

[1] Photo-enhanced toxicity, also known as phototoxicity, leads to long-term weakening of the swimming capacity of the fish that do survive exposure to PAHs. Compl. ¶ 99.

United States District Court
Northern District of California

various areas near the subject MGP sites.  *Id.* ¶ 88.  Where such testing has been done, by either PG&E or CCSF, high levels of PAHs have been discovered.  *Id.*  In groundwater in and around the subject MGP sites, including Clarke's home, high levels of PAH contamination as a result of MGP waste have been shown.  *Id.* ¶ 92.  PAHs have also been shown to migrate to other locations via groundwater, including into the Bay.  *Id.* ¶¶ 92-98.

## A.  Testing near North Beach MGP

Testing by CCSF over the past two decades near Gashouse Cove, a harbor in the San Francisco Bay, revealed that sediment in the tidal and submerged lands in an inlet bordering the North Beach MGP site is heavily contaminated with PAH-laden waste.  *Id.* ¶¶ 69-72.  There is also evidence of a significant deposit of coal tar seeping into the Bay.  *Id.* ¶¶ 73-74.  The testing determined that the waste migrated into the inlet from upland sources.  *Id.* ¶ 70.

Testing near the Marina substation, which is a PG&E-owned 0.25 acre parcel within the North Beach MGP footprint, revealed PAHs in unsaturated soil, saturated soil, and groundwater found on site.  *Id.* ¶ 75.  Further testing in another 0.3-acre parcel within the MGP footprint that previously functioned as the headquarters of the gasworks revealed the presence of "significant" amounts of PAHs in shallow soil and groundwater.  *Id.* ¶ 76.  The contamination was attributed to waste product from coal gasification, similar to the black rocks found at Clarke's home.  *Id.*

Every residence in the footprint of the North Beach MGP, including Clarke's home, that has been tested for contamination has required major remediation.  *Id.* ¶ 77.  Thus far, there have been six remediations, all of which have been accompanied by a requirement that the property owner enter into a land use covenant ("LUC") with PG&E that restricts future use of the property.  *Id.*

## B.  Testing near Fillmore MGP

Testing by CCSF in 1977 in preparation for construction of a combined sewer and storm water storage and transport system in the Marina neighborhood revealed "creosote residue" at multiple depths along Marina Boulevard.  *Id.* ¶ 80.  Creosote is a chemical substance that is created by the high-temperature treatment of sources such as coal, beech, or resin.  *Public Health Statement for Creosote*, U.S. AGENCY FOR TOXIC SUBSTANCES & DISEASE REGISTRY (Sept. 2002),

1    http://www.atsdr.cdc.gov/phs/phs.asp?id=64&tid=18.  The report for the study stated that the

2    contamination "probably result[ed] from previous gas plant activities."  Compl. ¶ 80.  The U.S.

3    Geological Survey also noted a "creosote smell" in the same area.  *Id.* ¶¶ 82-83.  When CCSF

4    conducted testing of the sediment in the West Basin Marina in 2011, it found PAH contamination

5    in two areas designated as "not suitable for unconfined aqua disposal."  *Id.* ¶ 84.

6         Ten residences within the Fillmore MGP footprint have known test results at this time.  *Id.*

7    ¶ 85.  Out of the ten, seven required major remediation with an LUC, and one required an LUC

8    but not remediation.  *Id.*  Two properties do not require an LUC or remediation, but it is not clear

9    that they are uncontaminated with MGP waste.  *Id.*

10         **C.  Testing near Beach Street MGP**

11         At the Radisson hotel, currently located on the former Beach Street MGP, groundwater and

12   soil testing in 1997 revealed "exceptionally high PAHs in soil and severe contamination of several

13   kinds in groundwater, attributable to the Beach Street MGP."  *Id.* ¶ 86.  B(a)P-EQ was found in

14   concentrations of up to 45,000 mg/kg.  *Id.*  Testing in 2012 at Pier 39 found elevated levels of

15   PAH in marina sediment samples.  *Id.* ¶ 87.  The B(a)P-EQ concentrations were measured at

16   45,000 ppm, or a 1 in 10 incremental risk of cancer.  *Id.*  The same areas were dredged and

17   retested in 2013 and elevated levels of PAHs were again found, indicating that contamination of

18   the Bay is ongoing.  *Id.*

19   **III. PROCEDURAL BACKGROUND**

20         The plaintiffs submitted a Notice of Intent to Sue letter ("NOI") to PG&E on April 29,

21   2014.  NOI (Dkt. No. 13-2).[2]  They seek declaratory relief on the grounds that PG&E violated the

22   RCRA (42 U.S.C. § 6972), the CWA (33 U.S.C. § 1311), and state nuisance and trespass laws.  *Id.*

23   ¶¶ 209-55.  The plaintiffs allege that the testing PG&E has undertaken thus far is "fundamentally

24   inadequate to address the endangerment to human health and/or the environment that . . . MGP

25   Wastes present, and/or may present in the future."  *Id.* ¶ 114.  They also allege that PG&E is

26

27   ────────────────

28   [2] I GRANT the defendants' request for judicial notice of the NOI, as it is a matter of public record.
     *See Jamul Action Comm. v. Stevens*, No. 2:13-CV-01920-KJM, 2014 WL 3853148, at *2 n.1 (E.D.
     Cal. Aug. 5, 2014).  I DENY all other requests for judicial notice as moot.  *See* Dkt. Nos. 13-1, 24.

United States District Court
Northern District of California

1    "recklessly and callously" resisting investigation into the dangers of MGP waste or properly

2    remediating the areas.  *Id.* ¶ 177.

3                                **LEGAL STANDARD**

4          Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

5    if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to

6    dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its

7    face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when

8    the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant

9    is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal

10   citations and quotations omitted).  There must be "more than a sheer possibility that a defendant

11   has acted unlawfully." *Id.*  While courts do not require "heightened fact pleading of specifics," a

12   plaintiff must allege facts sufficient to "raise a right to relief above the speculative level."

13   *Twombly*, 550 U.S. at 555, 570.

14         In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

15   court accepts the plaintiff's allegations as true and draws all reasonable inferences in its favor.  *See*

16   *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is not

17   required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact,

18   or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

19         "For purposes of ruling on a motion to dismiss for want of standing, both the trial and

20   reviewing courts must accept as true all material allegations of the complaint and must construe

21   the complaint in favor of the complaining party." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068

22   (9th Cir. 2011) (internal citations and quotations omitted).  "At the pleading stage, general factual

23   allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss

24   we presum[e] that general allegations embrace those specific facts that are necessary to support the

25   claim." *Id.*  The plaintiffs must establish standing for each claim independently.  *Id.*

26                                **DISCUSSION**

27   **I.   NOTICE**

28         PG&E argues that there was insufficient notice in the plaintiffs' NOI to establish subject

United States District Court
Northern District of California

matter jurisdiction because the plaintiffs failed to adequately identify a point source.  Mot. 11.  In

doing so, it contends that notice was faulty with respect to both the CWA and RCRA claims,

although it focuses only on the CWA claims.  *Id.* at 10.

Notice regarding an alleged violation of the CWA or RCRA requires "sufficient

information to permit the recipient to identify":

> [T]he specific [effluent] standard, limitation, or order alleged to
> have been violated, the activity alleged to constitute a violation, the
> person or persons responsible for the alleged violation, the location
> of the alleged violation, the date or dates of such violation, and the
> full name, address, and telephone number of the person giving
> notice.

40 C.F.R. § 135.3(a); *see also* 40 C.F.R. § 254.3(a).

Under the CWA, a plaintiff must provide notice of the alleged violation to the EPA, to the

state in which the alleged violation occurred, and to the alleged violator.  33 U.S.C.

§ 1365(b)(1)(A).  Where a citizen enforcement action fails to comply with CWA notice

requirements, the district court lacks subject matter jurisdiction and must dismiss the action.  *See*

FED. RULE CIV. P. 12(b)(1); *Natural Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 995 (9th

Cir. 2000).  The purpose of notice is twofold:  to allow the violator time to bring itself into

compliance with the CWA, and to alert appropriate agencies so that administrative action may

provide relief before courts must become involved.  *Gwaltney of Smithfield, Ltd. v. Chesapeake

Bay Found., Inc.*, 484 U.S. 49, 60 (1987); *Washington Trout v. McCain Foods, Inc.*, 45 F.3d 1351,

1354 (9th Cir. 1995).

CWA notice requirements are mandatory and must be strictly construed.  *Hallstrom v.

Tillamook Cnty.*, 493 U.S. 20, 31 (1989); *Sw. Marine*, 236 F.3d at 998.  The Ninth Circuit, even at

its most lenient, requires notice to inform the targeted party "precisely what it allegedly did wrong,

and when."  *Ctr. for Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 801 (9th Cir.

2008).  As long as the information in the notice letter is "reasonably specific" as to the nature and

time of the alleged violation, the CWA notice requirement is fulfilled.  *San Francisco BayKeeper,

Inc. v. Tosco Corp.*, 309 F.3d 1153, 1155 (9th Cir. 2002).  The NOI "does not need to describe

every detail of every violation . . . [;] it need only provide enough information that the defendant

1    can identify and correct the problem." *Id.*

2         PG&E does not contend that the plaintiffs failed to specify the nature of or the dates of the

3    alleged CWA violations.  Instead, it asserts that the NOI did not identify the T/S system as a

4    potential point source or as a manner and method by which MGP waste in groundwater is

5    transported to the Bay.  Mot. 9.

6         While the NOI was indeed silent as to the T/S system, that silence is not material to the

7    CWA notice requirements.  The T/S system is alleged as one pathway by which PAHs are

8    discharged into the Bay.  This fact does not change the complaint's basic argument about the

9    specific effluent standard that was violated, the activity constituting a violation, the persons

10   responsible for the violation, or the location and dates of the violation.  *See* 40 C.F.R. §§ 135.3(a),

11   254.3(a).  Moreover, the plaintiffs identify the MGPs, and not the T/S system, as the relevant point

12   sources in the complaint and the NOI.  Compl. ¶ 217; NOI at 2-3.

13        The NOI provided PG&E with adequate information to identify the violation – namely, the

14   discharge of MGP waste into the San Francisco Bay and the ongoing presence of PAHs in

15   groundwater and soil on the sites of former MGPs.  NOI at 3-10.  The NOI also specifically

16   alleged that PG&E failed to conduct groundwater testing that would have enabled it to gain

17   knowledge concerning the extent of the contamination and to remediate the MGP sites as

18   necessary.  *Id.* at 8.  The information conveyed is sufficient to inform PG&E of the violation and

19   how it can remedy it.  Therefore, the NOI satisfied the notice requirements of the CWA and the

20   RCRA.

21   **II.  STANDING**

22        In order to have standing under Article III, a plaintiff must show:  (i) that he has suffered

23   an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not

24   conjectural or hypothetical; (ii) the injury is "fairly traceable" to the challenged action of the

25   defendants; and (iii) that a favorable decision will be likely to redress the injury.  *Friends of the*

26   *Earth, Inc. v. Laidlaw Env't Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *see also Lujan v.*

27   *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  PG&E attacks both plaintiffs' standing to

28   bring their respective claims under the CWA and SFHA's standing to bring its RCRA claim.  Mot.

United States District Court
Northern District of California

17-18; Reply 4.

With respect to the CWA claims, PG&E argues that SFHA failed to establish the second and third requirements of standing. Mot. 17. PG&E's arguments are meritless. The complaint states that SFHA's members' livelihoods depend on the continued productivity and abundance of herring in the San Francisco Bay. Compl. ¶ 9. The increase in PAH levels in the Bay threatens the herring population, and is in turn caused by the discharge, without a permit, of PAHs from former MGP sites that PG&E owned and operated. *Id.* ¶¶ 9, 107, 212-19. The connection between the MGP waste and the heightened level of PAHs in the Bay is corroborated by allegations that testing done by PG&E and CCSF have demonstrated high levels of toxicity and contamination. *Id.* ¶¶ 92-98. SFHA has adequately pleaded that PG&E discharged a pollutant into the Bay that causes or contributes to its injuries. *See Sw. Marine*, 236 F.3d at 995.

SFHA has also satisfactorily requested redress under the CWA. It describes a continuing violation and seeks an injunction to compel PG&E to remediate the MGP waste purportedly endangering the environment of the Bay. Compl. ¶¶ 70, 87-88; *see also Sw. Marine*, 236 F.3d at 995) ("A plaintiff who seeks injunctive relief satisfies the requirement of redressability by alleging a continuing violation or the imminence of a future violation of an applicable statute or standard.") (internal citations and quotations omitted).

With respect to Clarke's claim under the CWA, PG&E argues that the complaint does not establish the "injury-in-fact" element of standing. Mot. 17-18. It asserts that Clarke's injury does not relate to navigable waters as required by the CWA and cases such as *Ecological Rights Foundation v. Pacific Lumber Co. Id.*; 230 F.3d 1141, 1149 (9th Cir. 2000) ("an individual can establish 'injury in fact' by showing a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable – that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction – if the area in question remains or becomes environmentally degraded."). PG&E argues that there is no case law to support Clarke's standing in the absence of any injury relating to the San Francisco Bay. Reply 6. Importantly, it does not cite to any authority that would require Clarke to assert an injury to the affected navigable water in order to establish standing. *See id.*

*Ecological Rights Foundation* and most other cases discussing the "injury-in-fact" requirement address the standing of individuals who had a recreational interest in the allegedly contaminated navigable water.  *See*, e.g., 230 F.3d at 1149; *Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.*, 469 F. Supp. 2d 803, 816 (N.D. Cal. 2007).  By contrast, in this case Clarke asserts that he has standing based upon actual or threatened diminution of the property value of his home.  Oppo. 25.  It is clear that the plaintiffs allege an "injury" to Clarke in the form of harm to his property.  This harm is fairly traceable to the activities of PG&E on the North Beach MGP.  Therefore, the issue I must address is the nexus between Clarke's injury and the alleged CWA violations.  Defendants urge that I require Clarke to allege some form of injury related to the allegedly contaminated navigable waters, *see* Reply 6, while plaintiffs advocate for a more liberal reading of injury-in-fact.  Oppo. 25.

The complaint states that Clarke's property is located within the historic footprint of the North Beach MGP point source.  Compl. ¶¶ 55, 231.  The waste on his property came in several forms and was "created, handled, stored, transported and/or disposed of at various locations within the grounds of the Subject MPG [sic] Site and/or in the vicinity thereof."  *Id.* ¶¶ 27, 49.  It was also allegedly transported onto Clarke's property from the groundwater.  *Id.* ¶¶ 211, 230.  Clarke has thus established an injury related to the point source and the conduit of the alleged CWA violations, but not to the relevant body of navigable water – the San Francisco Bay.

Although few courts have addressed this specific issue, cases indicate that a plaintiff bringing a CWA citizen suit can establish standing based upon a broad category of injuries.  *See* e.g., *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 982 (8th Cir. 2011) (indicating injury under the CWA from smoke and dust created by the defendants' activities, in addition to contamination of waterways); *Stephens v. Koch Foods, LLC*, 667 F. Supp. 2d 768, 781 (E.D. Tenn. 2009) (finding plaintiffs had standing to bring CWA claim even though defendants alleged that "their interests relate solely to their interests in land, not waters"); *see also Kentuckians for Commonwealth v. U.S. Army Corps of Engineers*, 963 F. Supp. 2d 670, 680 (W.D. Ky. 2013) *aff'd sub nom. Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698 (6th Cir. 2014); *Gulf Restoration Network v. Hancock Cnty. Dev., LLC*, 772 F. Supp. 2d 761, 766 (S.D.

1    Miss. 2011); *Snoqualmie Indian Tribe v. F.E.R.C.*, 545 F.3d 1207, 1217 (9th Cir. 2008).

2          Moreover, courts construe CWA standing liberally in other circumstances.  For instance, a

3    citizen may establish standing based upon "recreational use" of an affected body of water by

4    demonstrating only that he or she "suffer[s] in his or her degree of aesthetic or recreational

5    satisfaction." *Envtl. Prot. Info. Ctr.*, 469 F. Supp. 2d at 815 (standing where plaintiff lived several

6    hundred miles from the affected waterway and could only visit once per year); *see also Natural*

7    *Res. Def. Council v. U.S. E.P.A.*, 542 F.3d 1235, 1249 (9th Cir. 2008); *Sw. Marine*, 236 F.3d at

8    994; *Our Children's Earth Found. v. U.S. Envtl. Prot. Agency*, No. C 04-2132PJH, 2005 WL

9    6395158, at *3 (N.D. Cal. May 20, 2005).

10          In this case, the defendants' alleged action that violates the CWA is the "discharg[e] [of]

11    pollutants into the waters of the United States without a permit." Compl. ¶ 215.  These actions

12    also led to Clarke's injury as stated in the complaint.  The wastes on his property were generated

13    by the MGP and travelled through the soil and groundwater.  Therefore, the complaint satisfies the

14    requirements of standing by stating that Clarke was injured by waste from the point source and the

15    conduits involved in the defendants' alleged CWA violations.  Given courts' liberal treatment of

16    CWA standing requirements in other respects, I conclude that *Ecological Rights Foundation* does

17    not require that Clarke demonstrate an injury directly related to the affected navigable water under

18    the CWA.

19          PG&E also attacks SFHA's standing to bring its RCRA claim, arguing that "land-based

20    harms" are not germane to SFHA's organizational purpose.  Reply 4.  This position is groundless.

21    The gravamen of SFHA's complaint involves MGP waste that originated on land and is

22    transmitted into the Bay.  The fact that some of the contamination initially occurred on land is not

23    inconsistent with SFHA's goal of protecting the San Francisco herring fishery.  *See* Compl. ¶ 7.

24    Therefore, SFHA has standing to bring its claim under the RCRA.

25    **III. CWA CLAIMS**

26          The CWA "aims to restore and maintain the chemical, physical and biological integrity of

27    [the] Nation's waters." *Ass'n to Protect Hammersley v. Taylor Res.*, 299 F.3d 1007, 1009 (9th

28    Cir. 2002) (internal citations and quotations omitted).  With limited exceptions, it prohibits the

*United States District Court*
*Northern District of California*

12

1   discharge of pollutants into navigable waters of the United States. 33 U.S.C. §§ 1311(a),

2   1362(12). Any discharge of a pollutant from a point source into navigable waters is unlawful

3   unless the discharge is covered by a National Pollution Discharge Elimination System ("NPDES")

4   permit. 33 U.S.C. § 1311(a). To state a claim under the CWA, a plaintiff must allege "(1) the

5   ongoing addition of (2) a pollutant (3) to the navigable waters of the United States (4) from a point

6   source (5) without a permit (or in violation of a permit)." *Woodward v. Goodwin*, No. C 99-1103

7   MJJ, 2000 WL 694102, at *5 (N.D. Cal. May 12, 2000).

8          PG&E argues that both plaintiffs have failed to state a claim for relief under the CWA for

9   three reasons: (i) the claims describe wholly past violations, (ii) the plaintiffs inappropriately

10  identify MGPs as "point sources" of the pollution, and (iii) the claims largely relate to

11  groundwater, which is not considered "navigable water" subject to CWA protection. Mot. 12-17.

12                 **A.  Plaintiffs adequately alleged ongoing violations**

13         PG&E contends that the violations alleged in the complaint are "wholly past." Mot. 12. It

14  points to the fact that the MGP operations terminated between 84 and 106 years ago, and argues

15  that the "migration of residual contamination from previous releases does not constitute an

16  ongoing discharge." *Id.* at 13. Plaintiffs disagree, arguing that groundwater continues to transport

17  the contaminants to the Bay, thereby creating an ongoing violation. Oppo. 18.

18         "[C]itizens . . . may seek civil penalties only in a suit brought to enjoin or otherwise abate

19  an *ongoing* violation." *Gwaltney*, 484 U.S. at 58-59 (emphasis added). An ongoing violation may

20  be proven by showing that either (i) the violations continued on or after the date the complaint was

21  filed, or (ii) there is evidence from which a reasonable trier of fact could find "a continuing

22  likelihood of a recurrence in intermittent or sporadic violations." *Sierra Club v. Union Oil Co.*,

23  853 F.2d 667, 671 (9th Cir. 1988) (internal quotation marks omitted). Further, "[i]ntermittent or

24  sporadic violations do not cease to be ongoing until the date when there is no real likelihood of

25  repetition." *Id.* (internal citations and quotations omitted). As long as the plaintiffs make a good

26  faith allegation of continuous or intermittent violations, federal jurisdiction under the CWA

27  attaches. *Gwaltney*, 484 U.S. at 64-65.

28         Both parties spend much time debating whether the waste from the long-defunct MGP

United States District Court
Northern District of California

United States District Court
Northern District of California

1   operations constitutes an ongoing discharge.  However, I consider this dispute to be factual in

2   nature, and improper to consider on a motion to dismiss.  *See Sierra Club*, 853 F.2d at 669.  In the

3   instant case, the plaintiffs have provided enough facts to support an ongoing regulatory violation.

4   The complaint explicitly states that "PG&E has violated, and continues to violate, effluent

5   standards and limitations as defined under section 505(f) of the CWA . . . by discharging

6   pollutants into the waters of the United States without a permit . . . ."  Compl. ¶ 215.  It supports

7   this allegation with facts that "toxic chemicals from the MGP Wastes located in the soil of the

8   MGP Sites" are continually discharged into the Bay.  *Id.* ¶¶ 216-18.

9           Significantly, the complaint also alleges that PG&E's current behavior contributes to

10   ongoing violations relating to the MGP discharges.   It provides that PG&E's refusal to test for

11   contaminants in groundwater that serves as a conduit means that MGP sites will "*continue* to

12   present an imminent and substantial endangerment to human health and the environment . . . ."  *Id.*

13   ¶ 169 (emphasis added); *see also Marrero Hernandez v. Esso Standard Oil Co.(Puerto Rico)*, 597

14   F. Supp. 2d 272, 286 (D.P.R. 2009) ("the court concludes as reasonable plaintiffs' argument that

15   the failure [] to take remedial measures should be treated as a continuing violation, since it is not

16   the physical act of discharging toxic materials that gives rise to citizen standing under the CWA,

17   but the consequences of the discharge in terms of lasting environmental damage and adverse

18   health effects on the population").[3]  This is supported by allegations that PG&E has conducted

19   piecemeal testing on the subject MGP sites and their vicinities.  Compl. ¶ 196.  Independent

20   testing has revealed that despite remediation, a high level of contamination still exists and is

21   affecting the Bay.  *See id.* ¶¶ 35, 41, 47, 50-54.  Therefore, I find that the plaintiffs have

22   adequately alleged a continuing discharge.

23         **B. Plaintiffs sufficiently identified a point source of the contamination**

24         Only discharges of pollutants from "point sources" fall within the purview of the NPDES

25

26   [3] I note that whether migrating contaminants can constitute an ongoing violation when an unlawful activity has ceased is a question that has divided courts.  *See Sierra Club v. El Paso Gold Mines,*

27   *Inc.*, 421 F.3d 1133, 1140 (10th Cir. 2005), as corrected (Oct. 21, 2005) (discussing divergence in opinions); *N. California River Watch v. Fluor Corp.*, No. 10-CV-05105-MEJ, 2014 WL 3385287,

28   at *11 (N.D. Cal. July 9, 2014).  Because the complaint alleges both migrating contaminants and current allegedly unlawful activities, I need not resolve this issue at this time.

1 | program. 33 U.S.C. § 1311(a). The CWA defines a "point source" as:

2 |   [A]ny discernible, confined and discrete conveyance, including but
3 |   not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete
     fissure, container, rolling stock, concentrated animal feeding
4 |   operation, or vessel or other floating craft, from which pollutants are
     or may be discharged. This term does not include agricultural
5 |   stormwater discharges and return flows from irrigated agriculture.

6 | 33 U.S.C. § 1362. All other sources of pollution are characterized as nonpoint sources. *Oregon*

7 | *Natural Desert Ass'n v. U.S. Forest Serv.*, 550 F.3d 778, 780 (9th Cir. 2008).

8 |       The statutory definition of a point source is meant to be "extremely broad." *Borden Ranch*

9 | *P'ship v. U.S. Army Corps of Eng'rs*, 261 F.3d 810, 815 (9th Cir. 2001); *see also Envtl. Prot. Info.*

10 | *Ctr.*, 469 F. Supp. 2d 803, 820-821 (N.D. Cal. 2007). A "source" may be "[a]ny building,

11 | structure, facility, or installation from which there is or may be the discharge of pollutants." 33

12 | U.S.C. § 1316(a)(3). Factories responsible for discharging pollution have met the definition of a

13 | point source. *See League of Wilderness Defenders/Blue Mountains Biodiversity Project v.*

14 | *Forsgren*, 309 F.3d 1181, 1184 (9th Cir. 2002); *Natural Res. Def. Council v. U.S.E.P.A.*, 915 F.2d

15 | 1314, 1315 (9th Cir. 1990).

16 |       PG&E argues that the plaintiffs inappropriately identified the three subject MGP sites as

17 | "point sources" under the CWA. Mot. 13-16. It focuses on the definition of "point source" as a

18 | "confined and discrete conveyance," arguing that the designation of an entire MGP site is overly

19 | broad and does not specify a "conveyance" by which pollutants are discharged. *Id.* at 14-15. In

20 | addition, the defendants argue that the MGPs are not sufficiently definite to allow the defendants

21 | to eliminate discharge if the court orders injunctive relief. *Id.* at 15.

22 |       Many of the defendants' arguments, while appropriate in a motion for summary judgment,

23 | cannot be resolved on a motion to dismiss. I decline to hold as a matter of law that an entire

24 | factory or plant cannot be considered a "point source" under the CWA. *See,* e.g., *Williams Pipe*

25 | *Line Co. v. Bayer Corp.*, 964 F. Supp. 1300, 1319 (S.D. Iowa 1997) (an entire facility or industrial

26 | plant may be a point source). The complaint sets forth in detail the activities of the MGPs, how

27 | they emitted various pollutants into the soil and directly into the Bay, and several conduits by

28 | which the pollutants travel from the MGPs into the Bay. This includes via direct disposal into the

United States District Court
Northern District of California

15

San Francisco Bay waters, through groundwater, and through the T/S system.

Moreover, the defendants' argument that they do not control the MGPs does not support their position. At the time of the operations, the defendants had control over the MGPs, such that they would have been able to comply with a court order that required them to cease the allegedly unlawful activities. If the plaintiffs had alleged a more specific conveyance as a point source – the North Beach MGP tar well, for instance – there would still be an issue as to whether PG&E currently has control over the point source since it no longer owns that property. At any rate, the plaintiffs have requested that PG&E remediate the contaminated land and take steps necessary to prevent re-contamination. This remedy is potentially applicable to the entirety of the MGP sites and could be controlled by the defendants. Taking the pleaded facts as true, the plaintiffs have alleged a proper point source through which the defendants are discharging contaminants into the Bay.

### C. Plaintiffs properly alleged that the San Francisco Bay is a navigable water of the United States

Finally, PG&E argues that plaintiffs' CWA claims improperly relate to groundwater contamination, and that groundwater is not "navigable water" covered by the CWA. Mot. 16-17. "Navigable waters" are defined in the CWA as "waters of the United States." 33 U.S.C. § 1362(7); *see also* 40 C.F.R. § 122.2. The Supreme Court has defined "waters of the United States" as "only those relatively permanent, standing or continuously flowing bodies of water forming geographic features that are described in ordinary parlance as streams, oceans, rivers, and lakes." *Rapanos v. United States*, 547 U.S. 715, 732 (internal quotation marks omitted).

Notwithstanding the defendants' arguments, it is clear that the plaintiffs designate the San Francisco Bay, and not groundwater, as the navigable water that is affected under the CWA. The complaint plainly alleged that the discharge of pollutants into the Bay constitutes the CWA violation. Compl. ¶ 219. This is further supported by the NOI, which stated that the San Francisco Bay was the navigable water. NOI at 11 ("The San Francisco Bay . . . qualifies as navigable waters of the United States.").

As the plaintiffs point out, this case is similar to *Hawai'i Wildlife Fund v. Cnty. of Maui*.

1    In that case, the court rejected a similar argument because "[p]laintiffs do not appear to be arguing

2    that the groundwater requires protection for its own independent ecological value.  Instead, the

3    concern is that the County should not be allowed to pollute the ocean *through* that groundwater."

4    No. CIV. 12-00198 SOM/BM, 2014 WL 2451565 (D. Haw. May 30, 2014) (emphasis in original).

5    The same reasoning applies here, and the defendants' argument is unpersuasive.

6    **IV. RCRA CLAIMS**

7        "The factual allegations necessary to support a claim under the RCRA are:  (1) that the

8    defendant has generated solid or hazardous waste, (2) that the defendant is contributing to or has

9    contributed to the handling of this waste, and (3) that this waste may present an imminent and

10   substantial danger to health or the environment."  *KFD Enterprises, Inc. v. City of Eureka*, No. C

11   08-4571 MMC, 2012 WL 2196330, at *2 (N.D. Cal. June 14, 2012) (internal citations and

12   quotations omitted); *see also* 42 U.S.C. § 6972(a).  "[T]he citizen suit provision of the RCRA only

13   allows claims by parties acting as private attorneys-general rather than [those] pursuing a private

14   remedy."  *Aurora Nat. Bank v. Tri Star Mktg., Inc.*, 990 F. Supp. 1020, 1026 (N.D. Ill. 1998)

15   (internal citations and quotations omitted).

16       **A.  The complaint adequately alleges a violation of the RCRA on behalf of Clarke**

17       The parties do not appear to dispute (i) that PG&E generated solid or hazardous waste, and

18   (ii) that PG&E contributed to the handling of this waste.  Instead, they argue whether Clarke has

19   established an "imminent and substantial danger."  PG&E contends that Clarke's RCRA claims

20   fail because it offered to remediate Clarke's property and remove contamination to a depth of up

21   to five feet in the yard and 12 inches beneath the house.  Mot. 20.  It contends that this was

22   sufficient to remove any imminent and substantial danger.  *Id.* at 21.

23       First, it is not clear that Clarke's failure to accept PG&E's offer of remediation renders his

24   claims invalid.  PG&E has not cited any authority for its suggestion that a plaintiff cannot plead

25   imminent and substantial endangerment if he has rejected offers for remediation that would have

26   removed that endangerment.  *See id.*  But obviously, if PG&E's offered remediation would

27   remove all imminent and substantial danger from Clarke's home, then Clarke's RCRA claim may

28   fail.  *See*, e.g., *W. Coast Home Builders, Inc. v. Aventis Cropscience USA Inc.*, No. C 04-2225 SI,

United States District Court
Northern District of California

17

1    2009 WL 2612380, at *4 (N.D. Cal. Aug. 21, 2009) ("there is no basis for the relief plaintiff seeks

2    because the contamination is already being addressed by the DTSC"); *City of Fresno v. United*

3    *States*, 709 F. Supp. 2d 888, 907 (E.D. Cal. 2010).[4]

4            By contrast, if PG&E's proposed remediation would be insufficient under the RCRA to

5    remove any immediate and substantial danger, then Clarke's cause of action survives.  *See*, e.g.,

6    *Interfaith Cmty. Org. v. AlliedSignal, Inc.*, 928 F. Supp. 1339, 1346 (D.N.J. 1996) ("RCRA claim

7    concerning imminent and substantial endangerment to health or environment was not precluded by

8    on-going remediation").  In *Spillane v. Commonwealth Edison Co.*, the court stated that

9    "voluntary, self-funded participation in a state program does not preclude a simultaneous federal

10   suit.  The fact that the voluntary remediation may be ongoing does not moot the issue of

11   endangerment."  291 F. Supp. 2d 728, 736 (N.D. Ill. 2003).  It denied a motion to dismiss the

12   plaintiff's RCRA claim, in part because there remained an issue as to "whether there has been a

13   proper investigation with regard to the contamination, which brings into question whether the

14   level and degree of ongoing remediation is appropriate."  *Id.*; *see also Tilot Oil, LLC v. BP*

15   *Products N. Am., Inc.*, 907 F. Supp. 2d 955, 964 (E.D. Wis. 2012) ("the existence of a potential

16   remedy does not resolve the question of whether a remedy is necessary"); *SPPI-Somersville, Inc.*

17   *v. TRC Companies, Inc.*, No. 07-5824 SI, 2009 WL 2612227, at *11 (N.D. Cal. Aug. 21, 2009)

18   (denying summary judgment motion where defendant argued that remediation eliminated risk of

19   imminent and substantial danger, and issues of triable fact were raised).

20           The complaint alleges that PG&E's proffered remediation was inadequate.  Compl. ¶¶ 184-

21   91.  Clarke has asserted facts that, if true, allow a reasonable inference of immediate and

22   substantial danger on his property.  At this stage of the proceedings, there is an ongoing factual

23   dispute as to whether PG&E's proposed remediation would remove any imminent and substantial

24   endangerment.  Therefore, it is not appropriate to dismiss Clarke's claims under the RCRA.[5]

25   _____

26   [4] It is worth noting that these cases, and others with similar holdings, addressed the issue of
     imminent and substantial danger and any offset of remediation efforts on summary judgment.

27   [5] PG&E cites to *Price v. U.S. Navy*, 39 F.3d 1011 (9th Cir. 1994), in support of its argument that
     its remediation measures would remove any danger.  *Price* is distinguishable.  In that case, the

28   court was persuaded largely by the fact that concrete slabs were placed between contaminated soil
     and non-contaminated soil.  It noted that "concrete slab foundations and driveways act as effective

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The defendants also request that this court strike Clarke's claim under the RCRA as it

2  relates to the Fillmore and Beach Street MGPs.  Mot. 22.[6]  To satisfy Article III standing, the

3  complaint must allege that Clarke suffered some injury-in-fact from the Fillmore and Beach Street

4  MGPs that is "concrete and particularized."  *Covington v. Jefferson Cnty.*, 358 F.3d 626, 637 (9th

5  Cir. 2004) (finding individuals had standing under RCRA where they lived across the street from

6  landfill).   The defendants assert that this claim "fails for lack of standing as [Clarke] does not

7  allege that he resides or has any property interest within either of the footprints of these former

8  MGPs, and for failure to allege an injury in fact from the off-site contamination."  *Id.*

9    The complaint alleges that Clarke suffered a concrete and particularized injury, in the form

10  of waste contamination on his property.  It does not specify that this injury results from PG&E's

11  activities on the North Beach MGP only; rather, it discusses "MGP Waste migrating from *other*

12  *locations into the Clarke Home via ground water or another mechanism*."  Compl. ¶ 189

13  (emphasis added); *see also id.* ¶¶ 209-13.  After discovery, it may well be the case that the

14  Fillmore and Beach Street MGPs can be eliminated as a source of the waste contamination on

15  Clarke's property.  But taking the allegations in the light most favorable to the plaintiffs, Clarke

16  has stated a claim upon which relief can be granted under Rule 12(b)(6).  There are insufficient

17  grounds to strike the portion of his RCRA claim with respect to the Fillmore and Beach Street

18  MGPs, as these allegations are not "redundant, immaterial, impertinent, or scandalous."  FED. R.

19  CIV. P. 12(f).  The issue of whether wastes from all MGPs could migrate to Clarke's property

20  presents a factual question that cannot be resolved at this time.  The defendants' request to dismiss

21  or strike is denied.

22    **B.  SFHA's RCRA claim is precluded by the CWA**

23    The defendants argue that SFHA's RCRA claim fails for several reasons.  First, they argue

24

25  barriers or caps to any possible contamination."  *Id.* at 1020.  Here, PG&E's proposed remediation measures only required removal of the contaminated soil, but did not propose to embed concrete slabs below the non-contaminated soil.

26  [6] The plaintiffs argue that the defendants improperly moved to dismiss this portion of the

27  complaint pursuant to Rule 12(b)(6), when they should have moved to strike under Rule 12(f). They request leave to file a response if the court treats the defendants' argument as a motion to

28  strike.  Because I find that it is improper to dismiss or strike this portion of the complaint, the plaintiffs' request is denied as moot.

United States District Court
Northern District of California

1   that the claim is insufficiently well-pleaded because "it is unclear from the Complaint what SFHA

2   seeks to remedy with its RCRA claim." Reply 4. The complaint alleges that the MGPs generated

3   hazardous wastes, that PG&E contributed to the handling of that waste, and that this waste

4   presents an imminent and substantial danger to the environment – namely, the Bay and the herring

5   population. It provides facts to support each of these assertions. Therefore, the complaint

6   adequately states a claim for relief under Rule 12(b)(6). Although the defendants argue that SFHA

7   has not requested any relief with respect to its RCRA claim, *see* Mot. 22-23, this is not true. As

8   with the CWA claim, the plaintiffs request an injunction and other damages. *See* Compl. at 65.

9          Second, PG&E argues that regulatory oversight of the remediation efforts renders SFHA's

10  RCRA claim moot. Mot. 8-9. However, it does not provide any other information to support this

11  argument. As with Clarke's claim under the RCRA, the complaint provides that the oversight of

12  current remediation efforts is inadequate. Compl. ¶¶ 165-207. Therefore, a question of fact exists

13  regarding the remediation efforts, and the RCRA claim is not moot.

14         Finally, the defendants argue that SFHA's RCRA claims are precluded by the analogous

15  provisions of the CWA. Reply 4. The statute directs the EPA Administrator to "avoid

16  duplication, to the maximum extent practicable" between RCRA regulation and government

17  regulation under CWA and other environmental acts. 42 U.S.C. § 6905(b). It provides that

18  "[s]uch integration shall be effected only to the extent that it can be done in a manner consistent

19  with the goals and policies expressed in this chapter and in the other acts referred to in this

20  subsection." *Id.*

21         Courts have come to differing conclusions regarding the propriety of granting a motion to

22  dismiss based upon the anti-duplication provisions of the RCRA. In *Sherrill v. Mayor & City

23  Council of Baltimore*, the court granted a motion to dismiss the plaintiffs' RCRA claims on the

24  basis that they were inconsistent with state law analogous to the CWA. 31 F. Supp. 3d 750 (D.

25  Md. 2014). The critical question was "whether the [] Defendants' construction activities

26  themselves are regulated under the Clean Water Act and could be further regulated under RCRA

27  without the creation of a regulatory inconsistency." *Id.* at 774. It concluded that because there

28  were definite requirements under the CWA, "further remedial requirements imposed under RCRA

20

would be inconsistent with the remedial activities already deemed appropriate for the Site as part of the obligations imposed by the [state CWA regulations]." *Id.* at 775. Another case, *Coon v. Willet Dairy, LP*, affirmed the district court's finding on summary judgment in favor of the defendants because "if the Court allowed Plaintiffs' RCRA claim to proceed, it would be construing RCRA as inconsistent with [the CWA]." No. 5:02CV1195(FJS/GJD), 2007 WL 2071746, at *5-6 (N.D.N.Y. July 17, 2007) *aff'd sub nom. Coon ex rel. Coon v. Willet Dairy, LP*, 536 F.3d 171 (2d Cir. 2008).

Other courts have declined to dispose of RCRA claims based upon section 6905 at the motion to dismiss stage because "discovery is needed to determine if the RCRA and CWA are inconsistent." *Raritan Baykeeper, Inc. v. NL Indus., Inc.*, No. 09-CV-4117 JAP, 2013 WL 103880, at *27 (D.N.J. Jan. 8, 2013); *see also Cmty. Ass'n for Restoration of the Env't, Inc. v. George & Margaret LLC*, 954 F. Supp. 2d 1151, 1160 (E.D. Wash. 2013) ("At this stage of the proceedings the Court finds it premature to dismiss on the basis of the anti-duplication provision without allowing discovery as to whether the substances and activities addressed in the Consent Order and the Amended Complaint are in fact inconsistent in this case."). In cases where courts have found that section 6905 does not apply, they focused on the lack of complete overlap between a provision in the RCRA and other environmental statutes. *See*, e.g., *New York Communities for Change v. New York City Dep't of Educ.*, No. 11 CV 3494 SJ, 2012 WL 7807955, at *31 (E.D.N.Y. Aug. 29, 2012) *report and recommendation adopted,* No. 11CV3494 SJ CLP, 2013 WL 1232244 (E.D.N.Y. Mar. 26, 2013).

*Raritan Baykeeper* is pertinent to this case. There, the court stated: "[w]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective. When there are two acts upon the same subject, the rule is to give effect to both if possible . . . . Defendants have the burden to show that . . . an inconsistency would result." 2013 WL 103880, at *27 (internal citations and quotations omitted). For the RCRA anti-duplication provision to apply, PG&E's alleged violation of the RCRA must be regulated in its entirety by the CWA. For the reasons discussed, SFHA has properly alleged a violation of the RCRA, and neither party has explicitly provided why SFHA's

RCRA allegations are or are not consistent with its CWA allegations.  The defendants have not

met their burden to show that inconsistency will result if the court does not dismiss SFHA's

RCRA claim.  Therefore, I decline to dismiss SFHA's RCRA claim pursuant to section 6905.

**CONCLUSION**

For the above reasons, I DENY PG&E's motion to dismiss.  PG&E shall file an answer

within twenty days from the date of this order.

**IT IS SO ORDERED**.

Dated: February 26, 2015



WILLIAM H. ORRICK
United States District Judge

United States District Court
Northern District of California